IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| TRI-COUNTY METROPOLITAN TRANSPORTATION DISTRICT OF OREGON, an Oregon municipal corporation, | ) ) ) ) |
| Plaintiff, | ) )   No. CV-09-277-HU ) |
| v. | ) ) |
| MCI COMMUNICATIONS SERVICES, INC., a Delaware corporation, | )   OPINION & ORDER ) ) |
| Defendant. | ) ) |

John W. Stephens
Michael J. Esler
Kim T. Buckley
ESLER STEPHENS & BUCKLEY
888 S.W. Fifth Avenue, Suite 700
Portland, Oregon 97204-2021

        Attorneys for Plaintiff

William J. Ohle
Jay T. Waldron
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 S.W. Fifth Avenue, Suite 1900
Portland, Oregon 97204-3795

        Attorneys for Defendant

/ / /

1 - OPINION & ORDER

HUBEL, Magistrate Judge:

Plaintiff Tri-County Metropolitan Transportation District of Oregon (plaintiff or "TriMet"), brings this action against defendant MCI Communications Services, Inc., now doing business as Verizon Business Services (defendant or "MCI"), for restitution and a declaration that plaintiff does not owe defendant additional funds. Both parties move for summary judgment.

The parties have consented to entry of final judgment by a Magistrate Judge in accordance with Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c). For the reasons discussed below, I grant plaintiff's motion and deny defendant's motion.

BACKGROUND

In December 1990, defendant entered into a Right-of-Way Agreement (MCI ROW Agreement) with Burlington Northern Railway Company (BNR), in which BNR conveyed to defendant a limited easement to use a Rail Corridor, controlled by BNR at that time, for MCI's fiber optic communications system. Exh. A to Hardiman Declr. The Rail Corridor is generally located along I-5 and Highway 217, between Beaverton and Wilsonville.

In November 1997, Portland and Western Railroad (P&W) purchased from BNR, which had become Burlington Northern Santa Fe Railroad (BNSF), all of BNSF's track and other improvements needed for rail service on the Rail Corridor. Exh. E to Hardiman Declr. (Bill of Sale dated Nov. 25, 1997 between BNSF and P&W). On the same date, November 25, 1997, BNSF granted a "permanent and exclusive rail service easement" to P&W, for the purpose of "operating and/or developing rail service over, or constructing, maintaining, replacing or lawfully removing any rail facilities .

2 - OPINION & ORDER

1  . . that now, or in the future are present on the Rail Line
2  Corridors." Exh. E to Hardiman Declr.

3      In the spring of 1998, BNSF conveyed the Rail Corridor to the
4  Oregon Department of Transportation (ODOT). Exh. C to Hardiman
5  Declr. (Donation Contract between BNSF and the State of Oregon
6  dated April 24, 1998); Exh. D to Hardiman Declr. (Quitclaim Deed
7  dated May 12, 1998).

8      Beginning in 1996, before BNSF granted the easement to P&W and
9  before BNSF conveyed its interest in the Rail Corridor to ODOT,
10  Washington County, several cities in Washington County, TriMet,
11  Metro, and ODOT began studying the feasibility of a 14.7 mile
12  commuter rail line over the Railway Corridor between Wilsonville
13  and Beaverton. See Exh. G to Hardiman Declr. (Recitals contained
14  in Continuing Control Agreement). In September 1999, Washington
15  County began alternatives analyses and an environmental assessment
16  process for the commuter rail project. The Federal Transit
17  Administration (FTA), part of the United States Department of
18  Transportation, provided oversight and in 2004, authorized
19  commencement of the final design of the commuter rail project. Id.

20      On November 21, 2005, Washington County executed a Shared Use
21  Agreement with P&W which gave Washington County the right to
22  provide passenger service over P&W's rail line located within the
23  proposed commuter rail corridor. Id.

24      In March 2006, ODOT entered into a fifty-year Ground Lease of
25  the Rail Corridor with plaintiff, allowing plaintiff to construct
26  and operate the commuter rail project. Exh. H to Hardiman Declr.
27  At the same time, ODOT and plaintiff entered into a "Continuing
28  Control Agreement" which recited, inter alia, that plaintiff

3 - OPINION & ORDER

intended to enter into a Full Funding Grant Agreement (FFGA) with the FTA for acquisition, construction, operation, and maintenance of the commuter rail project, and further recited that the Shared Use Agreement between Washington County and P&W which was executed in November 2005, would be assigned to plaintiff within three business days of the date the FFGA was executed.  Exh. G to Hardiman Declr.

In September 2006, ODOT wrote to defendant to notify defendant that the location of a portion of defendant's fiber optic system within the right-of-way granted in the MCI ROW Agreement, had to be changed for the relocation or placement of railroad tracks and operational improvements in connection with the commuter rail project.  Exh. K to Hardiman Declr.

In late October 2006, plaintiff entered into the FFGA with the FTA.  Exh. I to Hardiman Declr.  Then, plaintiff and P&W entered into a fifty-year Shared Use Agreement which authorized plaintiff to provide passenger commuter rail service on the Rail Corridor.  Exh. J to Hardiman Declr.

In 2007, defendant, plaintiff, ODOT, and P&W entered into an "Interim Relocation Agreement," under which the parties acknowledged that ODOT, plaintiff, and P&W determined that the location of certain portions of defendant's fiber optic facilities had to be changed for the relocation or placement of railroad tracks and improvements in connection with the commuter rail project, and further, that defendant disputed the assertion by ODOT, plaintiff, and P&W that defendant was obligated to relocate its facilities at its own expense and cost.  Exh. B to Hardiman Declr. at p. 1.  Because ODOT, plaintiff, and P&W wanted to proceed

4 - OPINION & ORDER

with the project, they agreed that the "relocation payments [to reimburse defendant] called for by this Agreement will be made under protest and with a reservation of rights and that no party is waiving any claims or defenses in any legal proceeding by entering into this Agreement . . . ." Id. Under this interim agreement, plaintiff paid $142,533.50 to move defendant's fiber optic system.

In this litigation, plaintiff contends that because defendant had no right to the $142,533.50 plaintiff paid under protest, defendant has been unjustly enriched by the amount of that payment. Plaintiff seeks restitution of this amount, along with interest at the rate of nine percent per annum from March 16, 2007, the date plaintiff paid the money, until it is repaid.  Plaintiff also seeks a declaration that it does not owe an additional $170,023.10 in relocation expenses that defendant contends plaintiff owes to it.

STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.'"  Intel Corp. v.

5 - OPINION & ORDER

Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991) (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987)).  The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial.  Celotex, 477 U.S. at 322-23.

The substantive law governing a claim determines whether a fact is material.  T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  All reasonable doubts as to the existence of a genuine issue of fact must be resolved against the moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).  The court should view inferences drawn from the facts in the light most favorable to the nonmoving party.  T.W. Elec. Serv., 809 F.2d at 630-31.

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary.  Id.; In re Agricultural Research and Tech. Group, 916 F.2d 528, 534 (9th Cir. 1990); California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).

DISCUSSION

I.  Overview of Parties' Arguments

Plaintiff contends that financial responsibility for the relocation of defendant's fiber optic lines is governed by the terms of the MCI ROW Agreement. In particular, plaintiff relies on Section 13.2 of the MCI ROW Agreement which requires defendant to incur relocation expenses made necessary for the relocation or placement of railroad tracks or for railroad operational

6 - OPINION & ORDER

improvements.    Plaintiff argues that Section 13.3 of the MCI ROW Agreement, under which relocation expenses are borne by the railroad, does not apply because that section addresses relocations made to accommodate third parties.

Defendant argues that, assuming ODOT is the "Railroad," ODOT's request that defendant relocate its fiber optic system was made to accommodate plaintiff's commuter rail system and thus the relocation was required to accommodate a third party.    Thus, defendant contends that Section 13.3 applies and defendant is not responsible for the costs.

Alternatively, defendant argues that it is entitled to summary judgment because BNSF did not convey the benefits of the MCI ROW Agreement to ODOT.    Accordingly, defendant asserts, BNSF remains the "Railroad" within the meaning of the MCI ROW Agreement and only BNSF may enforce that agreement.

II.   Rules of Easement Construction

The Oregon Supreme Court has explained that

> [s]everal legal principles govern the proper construction of an instrument creating an easement, whether by reservation or express grant.    First, in such cases, "[i]t is the duty of the court to declare the meaning of what is written in the instrument." Minto v. Salem Water Etc. Co., 120 Or. 202, 210, 250 P. 722 (1976). Further, the court will look beyond the wording of the instrument "only where there is an uncertainty or ambiguity." Fendall v. Miller, 99 Or. 610, 619, 196 P. 381 (1921). If the wording at issue is uncertain or ambiguous, then the court must determine the intent of the original parties by examining the relevant surrounding circumstances.

Tipperman v. Tsiatsos, 327 Or. 539, 544-45, 964 P.2d 1015, 1019 (1998); see also Or. Rev. Stat. §§ (O.R.S.) 42.210-300 (Oregon statutes regarding interpretation of writings).

As I explained in a 1999 Opinion:

7 - OPINION & ORDER

"The interpretation of an express easement, like that of contracts and other written instruments, is a question of law for the court." <u>Kell v. Oppenlander</u>, 154 Or. App. 422, 426, 961 P.2d 861, 863 (1998) (citing <u>State Highway Comm'n v. Deal</u>, 191 Or. 661, 681-82, 233 P.2d 242, 251 (1951); Oregon Revised Statute (ORS) 42.230).

"In construing an easement, [the court's] fundamental task is to discern the nature and scope of the easement's purpose and to give effect to that purpose in a practical manner." <u>Watson v. Banducci</u>, 158 Or. App. 223, 230, 973 P.2d 395, 400 (1999) (citing <u>Bernards v. Link</u>, 199 Or. 579, 593, 248 P.2d 341, 347 (1952)). "To determine an easement's purpose [the court] 'look[s] first to the words of the easement, viewing them in the context of the entire document.'" <u>Id.</u> (quoting <u>Kell</u>, 154 Or. App. at 426, 961 P.2d at 863). Words in the grant of an easement are given their plain, ordinary meaning. <u>Fendall v. Miller</u>, 99 Or. 610, 616-17, 196 P. 381, 383 (1921). If the easement's terms clearly express the easement's purpose, the analysis ends here. <u>Watson</u>, 158 Or. App. at 230, 973 P.2d at 400.

"If ambiguity remains, [the court] look[s] to relevant surrounding circumstances for evidence of the original parties' intent [.]" <u>Id.</u> "[R]elevant considerations may include the easement's purpose, the circumstances existing at the time of the grant, and the manner in which the original parties used the easement." <u>Id.</u>

"In giving effect to an easement's purpose, general principles of reasonableness control." <u>Id.</u> at 231, 973 P.2d at 400. "Ordinarily, an easement passes no rights to the grantee except those rights that are necessary for the easement's reasonable and proper enjoyment." <u>Id.</u> The grantor retains "'full dominion and use of the land [subject to an easement], except so far as a limitation of the grantor's right is essential to the fair enjoyment' of the easement that was granted." <u>Id.</u> (quoting <u>Miller v. Vaughn</u>, 8 Or. 333, 336 (1880)) (brackets in <u>Watson</u>).

<u>Cal-Neva Land & Timber, Inc. v. United States</u>, 70 F. Supp. 2d 1151, 1157 (D. Or. 1999) (brackets in original).

III.  Construction of the MCI ROW Agreement

    A.  Relevant Terms of the Agreement

    The MCI ROW Agreement is dated December 18, 1990, and begins with several recitals.  The first recital provides that the Railroad controls a right-of-way, excluding buildings or

structures, within certain real property upon which it operates a rail transportation system.  Exh. A to Hardiman Declr. at p. 3. This is then referred to as the "Railroad Right-of-Way." Id.  The second recites that the Railroad is willing to grant to defendant the right to construct, install, operate, maintain, repair, reinstall, remove, and replace a fiber optic telecommunications transmission system and certain appurtenant equipment and structures "Within the Railroad Right-of-Way." Id.  The third recites that defendant wishes to acquire from the Railroad the right to construct and operate a fiber optic telecommunications transmission system and certain appurtenant equipment and structures (referred to as the "MCI System"), "Within the Railroad Right-of-Way, at locations designated in Exhibit A to the ROW Agreement." Id.

In the definition section, "Railroad" is defined as "Burlington Northern Railroad Company, a Delaware corporation and any parent, wholly owned subsidiary or affiliate of Railroad." Id. at p. 6.  "Within" is defined as "in, on, upon, over, under, across, along and through." Id. at p. 7.

Section 2 of the MCI ROW Agreement provides the "Grant of Rights by Railroad." Id. at p. 8.  Generally, the Railroad grants defendant the right to construct and operate the MCI system within various sections of the Railroad Right-of-Way. Id. (§ 2.1).  It states that

> [s]ubject to the terms and conditions of this Agreement, Railroad hereby grants to MCI, and MCI hereby accepts certain easement and related rights (the 'Rights'), at MCI's sole cost and expense: . . .  the immediate right to Construct and Operate the MCI System Within approximately 245.67 miles of Railroad Right-of-Way between the System Segment End Points of Seattle,

9 - OPINION & ORDER

Washington to Eugene, Oregon as shown on the Exhibit A[.]"

Id.

Section 2.4 includes the right of the Railroad to

construct and operate, and to change, modify or relocate, railroad tracks, signals, communication or other wire or fiber lines, pipelines, electric lines, and other railroad facilities Within any or all parts of the Railroad Right-of-Way or permit others to do so for Railroad, all or any of which may be freely done at any time or times by Railroad or others with Railroad's permission, without liability to MCI or to any other party for compensation or damages, unless and except to the extent that this Agreement otherwise expressly provides therefor.

Id. at p. 9 (§ 2.4(iii)).

Section 13 governs Railroad Relocations and Abandonment:

13.1 If, following Initial Construction of the MCI System, Railroad relinquishes or redefines the boundaries of Railroad Right-of-Way upon which the MCI System is located, such that the MCI System is later found to be outside the Railroad Right-of-Way, Railroad shall not require additional payments such as lease payments or easement fees other than as may be provided in Section 3 hereof.

13.2 If Railroad determines that the location of any of the MCI System must be changed for the relocation or placement of railroad tracks or Railroad operational improvements, or for reasons beyond the control of Railroad, Railroad shall notify MCI of such plans and shall use Railroad's best reasonable efforts to secure an alternative location for the MCI System. MCI shall move the affected MCI System to such alternative location at MCI's own expenses, costs and risk as soon as practicable. . . . .

13.3 If Railroad desires the relocation of a portion of the MCI System to accommodate third parties, Railroad shall notify MCI of such fact, and MCI shall promptly thereafter submit to Railroad a detailed, itemized estimate (the "Estimate") of the actual costs and expenses that MCI expects to incur, plus reasonable standard additives in moving the MCI System as requested by Railroad ("Moving Costs"). A list of standard additives will be provided to Railroad with any bills containing such additives. Upon receiving from Railroad fifty percent (50%) of the Estimate, MCI shall proceed, as expeditiously as feasible under the circumstances, to

10 - OPINION & ORDER

relocate the MCI System as directed by Railroad. Upon completion of such relocation and the submission to Railroad of invoices documenting the Moving Costs, Railroad shall promptly pay the balance of such Moving Costs, provided, however, that Railroad shall not be obligated to pay total Moving Costs in excess of One Hundred Ten Percent (110%) of the Estimate, unless Railroad requests changes in the approved design and/or construction methods in which event MCI shall submit to a revised Estimate.

Id. at pp. 27-28.

B.  Discussion

Both parties offer various arguments as to why the MCI ROW Agreement requires the opposing party to bear the cost of relocating the MCI System caused by the commuter rail project.

Under Section 13.2, assuming, as defendant does for the purpose of this argument, that ODOT is "the Railroad," the operative language reads:

If [ODOT] determines that the location of any of the MCI System must be changed for the relocation or placement of railroad tracks or [ODOT] operational improvements, or for reasons beyond the control of [ODOT], . . . MCI shall move the affected MCI System to such alternative location at MCI's own expense, cost and risk as soon as practicable.

Exh. A to Hardiman Declr. at p. 27 (§ 13.2).

The plain language states that MCI is responsible for the relocation costs when ODOT determines that the location of the MCI System has to be changed due to (1) relocation or placement of railroad tracks, or (2) operational improvements of ODOT, or (3) reasons beyond ODOT's control.

Under Section 13.3, "[i]f [ODOT] desires the relocation of a portion of the MCI System to accommodate third parties," then ODOT is responsible for the costs of relocating the MCI System. Id. at p. 28 (§ 13.3). The MCI ROW Agreement does not further define

11 - OPINION & ORDER

1  "accommodate" or "third parties."  The plain language of this
2  section indicates that when the MCI System is relocated because
3  ODOT is accommodating a third party, ODOT bears the relocation
4  costs.

5       Depending on the interpretation of the language in these two
6  sections, a conflict could arise if ODOT determined that the
7  location of the MCI System had to be changed due to the relocation
8  or placement of tracks required by ODOT to accommodate a third
9  party.  Defendant argues that these are the facts present here and
10 that it violates basic rules of contract interpretation to (1) read
11 Section 13.2 to require defendant to bear relocation costs for <u>any</u>
12 relocation or placement of railroad tracks while (2) also reading
13 Section 13.3 to require ODOT to bear the relocation cost whenever
14 the relocation is required to accommodate a third party.

15      To harmonize the two provisions and give them both effect,
16 defendant argues that Section 13.2 applies when the relocation or
17 placement of track is required for ODOT's needs, but Section 13.3
18 controls any time the MCI System must be moved to accommodate the
19 needs of a third party.  Defendant contends that the phrase
20 "relocation or placement of railroad tracks" in Section 13.2 should
21 be read as a specific example of "Railroad operational
22 improvements" such that it is only when the relocation or placement
23 of tracks is required by the Railroad, meaning ODOT, that Section
24 13.2 applies.  Any other relocation or placement falls under
25 Section 13.3.

26      Plaintiff contends that Section 13.2 should control over
27 Section 13.3 because Section 13.2 precedes Section 13.3.
28 Additionally, plaintiff argues that because railroad operation

12 - OPINION & ORDER

purposes are paramount to fiber optic purposes under the MCI ROW Agreement, Section 13.2 "trumps" Section 13.3.

In construing a contract, "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect[.]" Restatement (Second) of Contracts § 203(a) (1981); see also Anderson v. Divito, 138 Or. App. 272, 278, 908 P.3d 315, 320 (1995) (Oregon Revised Statute § (O.R.S.) 42.230 "requires construction of the contract as a whole, giving effect to every word and phrase."). Thus, "[t]he usual rule of interpretation of contracts is to read provisions so that they harmonize with each other, not contradict each other." Peterson v. Minidoka County School Dist. No. 331, 118 F.3d 1351, 1359 (9th Cir.), amended, 132 F.3d 1258 (9th Cir. 1997); see also Sanders v. Oregon Pac. States Ins. Co., 314 Or. 521, 527, 840 P.2d 87, 90 (1990) (noting, in context of statutory construction, that if there is a conflict between provisions, it is the court's duty to try to harmonize them).

The analysis starts with the language in Section 13.2. The three conditions requiring defendant to pay the relocation costs are separated by the word "or," meaning each one stands independent of the other. The word "railroad" in the phrase "relocation or placement of railroad tracks" is written with a lower case "r", and thus is not "the Railroad" as earlier defined in the MCI ROW Agreement. There is no modifying language to the phrase "relocation or placement of railroad tracks." With the lower case "railroad" and no modifiers to the condition "relocation or placement of railroad tracks," the plain language obligates

13 - OPINION & ORDER

defendant to bear the costs of moving its MCI System caused by <u>any</u> "relocation or placement of tracks."  The plain language does not restrict defendant's obligation to a relocation or placement of tracks caused by or benefitting ODOT.

In contrast to the first triggering condition, the second triggering condition, "[ODOT] operational improvements," contains a restrictive modifier by mandating that ODOT be the party whose operational improvements cause a change in the MCI System location. The use of "Railroad" (meaning ODOT) in this second triggering condition shows that the drafters knew how to require that the condition be related to a need of ODOT (or anyone else standing in the Railroad's shoes).

When these first two triggering conditions are considered together[1], the most logical interpretation, and the one that gives effect to all of the conditions triggering defendant's obligation to pay for the relocation costs under Section 13.2, is to read "relocation or placement of railroad tracks" to mean any such relocation or placement, regardless of the entity requesting, requiring, or benefitting from, the relocation or placement.  This is because if, as defendant suggests, the phrase "[ODOT] operational improvements" includes the "relocation or placement of railroad tracks," the "relocation or placement of railroad tracks" no longer has any independent meaning or effect and the first

---

[1]  The third triggering condition, "reasons beyond the control of [ODOT]," is not at issue in the case and does not provide meaningful context for the interpretation of the prior two conditions other than to show, once again, the use of the upper case Railroad as distinguished from the lower case railroad.

14 - OPINION & ORDER

1   triggering condition is surplusage.  Such an interpretation is to
2   be avoided.  Thus, to give effect to the "relocation or placement
3   of railroad tracks" condition, Section 13.2 must be interpreted to
4   mean exactly what that provision says:  defendant bears the burden
5   of paying for relocation costs of its MCI System when the location
6   of the MCI System is changed because of the relocation or placement
7   of any railroad tracks.

8       This construction of Section 13.2 does not negate the
9   "accommodation of third parties" language in Section 13.3 when that
10  section is interpreted to apply to costs of changing the location
11  of the MCI System caused by accommodating a need of a third party
12  other than a need to relocate or place railroad tracks.  That is,
13  when ODOT accommodates a third party's needs other than by
14  relocating or placing tracks, then ODOT is responsible for any
15  costs incurred in changing the location of the MCI System under
16  Section 13.3.  But, if the change of location of the MCI System is
17  caused by any relocation or placement of tracks, or by ODOT's
18  operational improvements, or by a reason beyond ODOT's control,
19  then defendant bears the burden of such costs under Section 13.2.

20      This construction of Sections 13.2 and 13.3 relies on the
21  plain, ordinary meaning of the words, gives effect to all of the
22  conditions recited in Section 13.2, and harmonizes Sections 13.2
23  and 13.3 by giving them both effect.  Moreover, this interpretation
24  is consistent with the MCI ROW Agreement's stated intent that the
25  fiber optic needs of defendant are subordinate to the use of the
26  land for railroad purposes.  See § 2.4 of MCI ROW Agreement (Exh.
27  A to Hardiman Declr. at p. 9) (providing that rights granted to
28  defendant are subordinate to the "prior and continuing right of

15 - OPINION & ORDER

[ODOT]" to use and maintain the property in the operation of its railroad, to dispose of all or any part of its property, and to construct and operate, change, modify, relocate tracks, signals, communication or other fiber lines, pipelines, electric lines, and "other railroad facilities" within the Right-of-Way).

Defendant's additional arguments do not warrant extensive discussion. First, defendant contends that various other contracts related to the Rail Corridor, the use or control of the Railroad Right-of-Way, and the development of the commuter rail project[2] all give plaintiff control over and sole responsibility for the commuter rail project.  This argument is not relevant to the interpretation of the plain language of the MCI ROW Agreement. Even if defendant accurately represents the provisions in those contracts, the interpretation of the MCI ROW Agreement provided above is not inconsistent with TriMet possessing control over and responsibility for the commuter rail project.

Second, defendant relies on an August 8, 2006 letter from John Geil, the Oregon Department of Justice's Attorney-in-Charge of the Commercial Condemnation & Environmental Litigation Section, to John Stephens, plaintiff's counsel.  Exh. 8 to Sarratt Declr.  Geil wrote the letter in response to plaintiff's request to ODOT that ODOT inform AT&T and defendant that they must relocate their telecommunications cables in order to accommodate plaintiff's proposed commuter rail project.  Id.  ODOT denied the request because ODOT believed it did not have authority to require

_____

[2]  Defendant cites to the Ground Lease, the Continuing Control Agreement, TriMet's Shared Use Agreement with P&W, and the FFGA.  Exhs. G, H, I, and J to Hardiman Declr.

16 - OPINION & ORDER

1  defendant and AT&T to relocate their telecommunication cables. <u>Id.</u>

2  Geil, writing on behalf of ODOT, put forth two arguments supporting

3  the denial.   The first argument concerned whether the MCI ROW

4  Agreement under which the easement was originally granted to

5  defendant by BNSF, was later conveyed with the land to ODOT. <u>Id.</u>

6  Alternatively, ODOT argued that the Continuing Control Agreement

7  transferred to plaintiff any authority ODOT possessed requiring

8  existing easement holders to relocate their easements to

9  accommodate the commuter rail project.  <u>Id.</u>

10     Notably, neither argument interprets the language of Sections

11  13.2 and 13.3 of the MCI ROW Agreement.    Neither argument

12  interprets the identical right-of-way agreement BNSF made with

13  AT&T.  Thus, the argument about what Geil wrote on behalf of ODOT

14  is not relevant to the proper construction of Sections 13.2 and

15  13.3 of the MCI ROW Agreement.

16     Finally, both Judge Haggerty[3] and Judge Aiken[4] have issued

17  related opinions which the parties here discuss and rely on. <u>AT&T</u>

18  <u>Commc'ns-East, Inc. v. BNSF Rwy Co.</u>, No. CV-06-866-HA, 2006 WL

19  3408035 (D. Or. Nov. 27, 2006), <u>aff'd</u>, 323 Fed. Appx. 487, 2009 WL

20  725174 (9th Cir. Jan. 22, 2009) (unpublished opinion); <u>MCI</u>

21  <u>Telecomms. Corp. v. Tri-County Metro. Transp. Dist. of Or.</u>, No. CV-

22  97-807-AA, Opinion (D. Or. Apr. 23, 1998), <u>aff'd</u> 201 F.3d 444, 1999

23

24     [3]  In Judge Haggerty's case, BNR granted a nearly identical
25  easement in the same real property as in the instant case, to
   AT&T.

26     [4]  Judge Aiken's case involved the same easement to MCI as
27  in the instant case, but the real property at issue was land on
   which MAX light rail to Hillsboro was constructed and was not the
28  land used for the commuter rail project.

17 - OPINION & ORDER

1  WL 1000903 (9th Cir. Nov. 3, 1999) (unpublished opinion).

2      I discuss these opinions in more detail below.  But, at this
3  juncture, I agree with defendant that Judge Aiken's case is not
4  instructive here because although she interpreted Sections 13.2 and
5  13.3 of the MCI ROW Agreement, in the case before her BNSF conveyed
6  the land directly to plaintiff.  As a result, plaintiff, not ODOT,
7  was "the Railroad," and plaintiff's request that defendant change
8  the location of the MCI System was made on its own behalf, not on
9  behalf of a third party.  Judge Aiken never considered the argument
10  that defendant makes here.

11      Judge Haggerty discussed a nearly identical easement granted
12  by BNR to AT&T, in the context of the identical subsequent grant of
13  the Rail Corridor by BNSF to ODOT.  He stated that Section 11(a) of
14  the AT&T Right-of-Way (ROW) Agreement, which is nearly identical[5]
15  to Section 13.2 of the MCI ROW Agreement, controlled.  Although
16  Judge Haggerty's conclusion is not binding here because it was a
17  different easement with a different party, and there is no
18  indication that he was squarely presented with the argument made
19  here, the interpretation of the MCI ROW Agreement that I set forth
20  herein is consistent with his conclusion.

21

22      [5]  The differences between Section 13.2 of the MCI ROW
    Agreement and Section 11(a) of the AT&T ROW Agreement are minor
23  and of no consequence.  First, all references to MCI or to the
    "MCI System," in Section 13.2 of the MCI ROW Agreement appear as
24  AT&T or the "AT&T Facilities" in the AT&T ROW Agreement.  Second,
    in the AT&T ROW Agreement, the word "any" appears in the third
25  triggering condition between the words "for" and "reasons" so
    that the third triggering conditions is "or for any reasons
26  beyond the control of Railroad[.]"  Compare Exh. A to Hardiman
    Declr. at p. 27 (MCI ROW Agreement) with AT&T, 2006 WL 3408035,
27  at *7 (Judge Haggerty opinion quoting Section 11(a) of the AT&T
    ROW Agreement).
28

18 - OPINION & ORDER

1    Additionally, the Ninth Circuit, in affirming Judge Haggerty,
2    stated that because the AT&T ROW Agreement ran with the land when
3    BNSF conveyed the Beaverton segment to ODOT, "ODOT had authority
4    under Section 11(a) of the ROW to require AT&T to relocate its
5    fiber optic facilities at its expense to accommodate the placement
6    of new railroad tracks."  2009 WL 725174, at *1.  Thus, the
7    interpretation I set forth is also consistent with the Ninth
8    Circuit's conclusion.

9    Accordingly, assuming, as defendant does for the purposes of
10   this argument, that ODOT is "the Railroad" under the MCI ROW
11   Agreement, I agree with plaintiff that the request to change the
12   location of the MCI System was made for the relocation or placement
13   of railroad tracks as set forth in Section 13.2 of the MCI ROW
14   Agreement, triggering defendant's obligation to pay for the
15   relocation of the MCI System.

16   IV.  Conveyance of the Interest by BNSF to ODOT

17   Defendant seeks summary judgment in its favor, and argues
18   against summary judgment for plaintiff, for the independent reason
19   that, according to defendant, BNSF did not convey the benefits of
20   the MCI ROW Agreement to ODOT and therefore, BNSF remains the
21   Railroad within the meaning of the ROW Agreement.  If BNSF is the
22   Railroad, then ODOT cannot enforce the payment obligations in
23   Section 13.2 of the MCI ROW Agreement.

24   As noted in the background section above, in the spring of
25   1998, BNSF conveyed the Rail Corridor to ODOT.  The operative
26   documents memorializing this conveyance are the April 24, 1998
27   Donation Contract and the May 12, 1998 Quitclaim Deed.  Exhs. C and
28   D to Hardiman Declr.

19 - OPINION & ORDER

In the Quitclaim Deed, BNSF quitclaimed to ODOT, "all of [BNSF's] right title and interest . . . in and to parcels of land located in the Counties of Washington, Clackamas, Marion, and Multnomah, State of Oregon, as such parcels of land are more particularly described in Attachment 1[.]"  Exh. D to Hardiman Declr. at p. 1.  This conveyance was

> SUBJECT, however, to all existing interests in the Premises, including but not limited to the Rail Service Easement granted to Portland & Western Railroad, Inc., on November 25, 1997, and all reservations, easements and other encumbrances, of record or otherwise.

Id.

Additionally, the Quitclaim Deed expressly reserved unto BNSF, its successors and assignees,

> a non-exclusive, permanent easement for construction, reconstruction, maintenance, use and/or operation of one or more pipelines or fiber optic communication lines, together with related facilities and appurtenances in, under, across, along and through any 10-foot wide portion of the Premises, including the right for [BNSF], its successors and assignees, or any of its licensees, to enter, disturb the surface, and occupy the Premises for purposes of constructing, reconstructing, maintaining, using and/or operating one or more pipelines or fiber optics communication lines, facilities and appurtenances in, under, across, along and through all or any portion of the Premises . . . .

Id. at p. 2.

The Donation Contract recites that ODOT desires to obtain BNSF's ownership interests in "the following rail corridors[.]" Exh. C to Hardiman Declr. at p. 2.  Following the description of the property, the Donation Contract makes clear that the conveyance is of "all of BNSF's ownership interest in the Rail Corridors" except for "any and all rail, ties, spikes," etc., including "other improvements needed for rail service," and any vehicles, "maintenance equipment on wheels," etc., that are present on the

20 - OPINION & ORDER

Rail Corridors on the date of closing.  Id. at pp. 3-4.

The Donation Contract then states that the conveyance is "subject to the terms and conditions set forth" in

> [1] this Agreement, [2] in the Quitclaim Deed, and/or [3] in any agreement assigned by BNSF to ODOT by the terms of this Agreement, including BNSF's retained interests, as specified in more detail in the Quitclaim Deed, for a non-exclusive, permanent easement for construction, maintenance and operation of one or more pipelines or fiber optic communication lines, together with related facilities and appurtenances, in, under, across, along and through any 10-foot wide portion of the Rail Corridors, on conditions that do not significantly increase the liability risk of the rail serve operator over the Rail Corridors and do not significantly interfere with rail operations, construction or maintenance activities on the Rail Corridors[.]

Exh. C to Hardiman Declr. at p. 4.[6]

Under both the Quitclaim Deed and the Donation Contract, when BNSF donated its interest in the Rail Corridors to ODOT, BNSF expressly retained for itself a non-exclusive, permanent easement for the construction, etc., of one or more pipelines or fiber optic communication lines.  Defendant argues that this reserved easement is the easement BNSF granted to defendant in the MCI ROW Agreement.

In support of this argument, defendant primarily relies on

_____

[6]  The language in what I have delineated as the third type of agreement the Donation Contract is subject to is less than clear.  Under this provision, the conveyance in the Donation Contract is subject to any agreement assigned by BNSF to ODOT by the terms of the Donation Contract.  I take this to refer to Section 2 of the Donation Contract entitled "Assignment of Rail Corridor Contracts" and discussed more fully below.  The confusing language is that after stating that the conveyance is subject to any agreements assigned by BNSF to ODOT under the Donation Contract, the following words appear:  "including BNSF's retained interests, as specified in more detail in the Quitclaim Deed, for a non-exclusive, permanent easement . . . . "  The use of "including," suggests that the interest for the fiber optic easement retained by BNSF was "assigned" by BNSF to ODOT.  This makes little sense.

21 - OPINION & ORDER

Section 2 of the Donation Contract which addresses assignments of rail corridor contracts. In Section 2, BNSF first assigns to ODOT (1) all assignable rights and obligations of BNSF which accrue after closing, (2) to the extent they are related to the rail corridors, and (3) are set forth in any agreement identified in Exhibit D. <u>Id.</u> at p. 4. The MCI ROW Agreement is not identified in Exhibit D.

Next, Section 2 provides that ODOT accepts the assignment of these rights and obligations, in accordance with the terms of each applicable agreement and the Donation Contract. <u>Id.</u> at pp. 4-5. BNSF, not ODOT, is responsible for performing BNSF's duties in assigned agreements which accrue on or before closing. <u>Id.</u> at p. 5. ODOT, not BNSF, is responsible for performing all assignee duties in assignment agreements accruing after the closing date. <u>Id.</u>

Section 2 then states that BNSF reserves the rights and obligations set forth in any agreement identified in Exhibit D, to the extent those rights are related to (1) one or more other rail corridors or BNSF property, and (2) to the extent those rights are related to BNSF's retained fiber optic easement. <u>Id.</u>

Finally, Section 2 provides that "[i]f any contract is related to the Rail Corridors, and not to rail service provided over the Rail Corridors or fiber optic facilities now located on the Rail Corridors, but inadvertently is not identified in Exhibit D," BNSF is to provide ODOT a copy of the contract and assign it to ODOT, and ODOT is to assume the rights and obligations in that contract to the extent they are related to the Rail Corridors. <u>Id.</u>

Defendant argues that Section 2 of the Donation Contract makes

22 - OPINION & ORDER

clear that the parties to that contract did not intend to convey, as part of the Donation Contract, any contracts relating to fiber optic facilities, including defendant's facilities, then located on the Rail Corridors.  Defendant notes that the MCI ROW Agreement is not listed in Exhibit D to the Donation Contract.  Additionally, under the final provision in Section 2, the parties underscored their intent to omit any contract related to fiber optic facilities then located in the Rail Corridor from being identified in Exhibit D.  Thus, defendant contends, by reserving and not conveying responsibility for defendant's fiber optic facilities in the Right-of-Way, BNSF remains the Railroad under the MCI ROW Agreement.

I agree with defendant that Section 2 makes clear that a contract related to fiber optic facilities then located in the Railroad Corridor was not identified in Exhibit D and was not meant to be identified in Exhibit D.  Assuming that the MCI ROW Agreement was purposefully excluded from the list of agreements in Exhibit D, then, under the language of Section 2, it follows that BNSF did not assign to ODOT any assignable rights and obligations of BNSF related to the MCI ROW Agreement which accrued after closing because such rights and obligations were not set forth in an agreement identified in Exhibit D and clearly were not meant to be set forth there.

Notably, however, Section 2 concerns <u>assignments</u>.  As discussed below, I conclude that the initial conveyance by BNSF to ODOT of all of BNSF's "right title and interest" subject to "<u>all</u> existing interests . . . including but not limited to . . . <u>all</u> reservations, easements and other encumbrances, of record or otherwise" included the easement created by the MCI ROW Agreement

23 - OPINION & ORDER

1   because the easement runs with the land.  With the easement being
2   transferred to ODOT by virtue of the conveyance itself, then there
3   was simply no need for BNSF to assign it to ODOT in Section 2.
4   Accordingly, the absence of the MCI ROW Agreement from Exhibit D
5   does not persuade me that the parties intended that BNSF reserve to
6   itself the easement created by the MCI ROW Agreement.

7       I agree with plaintiff that defendant's position that when
8   BNSF conveyed the property to ODOT, BNSF also retained its interest
9   in the MCI ROW Agreement, is illogical, is inconsistent with Oregon
10  property law, and is inconsistent with the conclusions made by
11  Judge Aiken and Judge Haggerty in their respective, related cases.

12      First, plaintiff indicates that it makes little sense for BNSF
13  to have retained only a "burden" on the estate when it conveyed the
14  remainder of its property interest to ODOT.  Additionally,
15  plaintiff contends that it makes little sense for BNSF to have
16  conveyed the property to ODOT subject to the MCI ROW Agreement, and
17  then retain the power to require defendant to move defendant's
18  fiber optic system at defendant's expense due to railroad track
19  relocation or placement or due to railroad operational improvements
20  when BNSF no longer owned the track and no longer conducted
21  railroad operations in the property.  I agree with plaintiff.

22      Second, under Oregon law, the burden of an easement is
23  presumed to run with the servient estate.  The Oregon Supreme Court
24  has explained that

25          [r]ights conferred by an easement attach to the estate
            and not to the person of the dominant tenement and they
26          follow that estate into the hands of the assignee
            thereof.  On the other hand, they are a charge upon the
27          estate or property of the servient tenement and follow it
            into the hands of any person to whom such tenement or any
28          part thereof is subsequently conveyed.

24 - OPINION & ORDER

Monese v. Struve, 155 Or. 68, 77, 62 P.2d 822, 825 (1936); see also Beck v. Lane County, 141 Or. 580, 592, 18 P.2d 594, 598 (1933) ("The [property] . . . passed to the [successor] incumbered [sic] by the easement, so covenanted or reserved, and the right and burden thus created passed to and was binding upon all subsequent grantees of the respective properties.").

The express language in the Quitclaim Deed that the grant to ODOT was subject to all existing interests in the property, including all easements of record or otherwise, is consistent with Oregon property law. Under Oregon law, when BNSF conveyed the Railroad Segment to ODOT, the "burden" of the easement created by the MCI ROW Agreement ran with the Railroad Segment land.

Third, both Judge Aiken's and Judge Haggerty's opinions are instructive. Judge Aiken construed the same MCI ROW Agreement, but in the context of a conveyance from BNSF to TriMet, not ODOT. MCI Telecomms., Op. at p. 3. MCI argued that BNR never assigned its rights under the MCI ROW Agreement to TriMet as required by Section 26.1 of the MCI ROW Agreement and therefore, TriMet possessed no rights under the MCI ROW Agreement to require MCI to relocate its fiber optic system at its own expense. Id. at p. 4.

Judge Aiken ruled for TriMet on the basis that the easement passed with the land and thus, TriMet succeeded to BNR's rights under the easement as a matter of law. Id. at pp. 4-7. TriMet then had the authority to require MCI to relocate its system at MCI's expense under Section 13.2 of the MCI ROW Agreement. Id.

Judge Aiken noted that under the deed from BNR to TriMet, TriMet took possession of the property "subject to all encumbrances," which thus included the MCI ROW Agreement. Id. at

25 - OPINION & ORDER

1  pp. 4-5.  She explained that MCI's argument required the court to

2  enforce the MCI ROW Agreement's easement rights, but not to enforce

3  the  reciprocal  obligation  by  MCI  to  pay  for  relocation.   She

4  rejected this position because both the rights and obligations of

5  the easement were created by the same instrument.  Id. at p. 5.

6  She further explained that the common law rule that an easement

7  runs with the land enables the easement to survive in the absence

8  of  an  assignment,  thus  avoiding  the  contradictions  of  MCI's

9  position.  Id. at pp. 6-7.

10     The Ninth Circuit affirmed Judge Aiken.  The Ninth Circuit

11 noted that the MCI ROW Agreement expressly provided that "[t]his

12 Agreement shall be binding upon and inure to the benefit of the

13 parties hereto and their respective successors or assigns."  1999

14 WL 1000903, at *1.  This language negated MCI's argument that the

15 easement was personal to MCI.  Id.  The court noted that use of the

16 words "successors or assigns" was traditionally seen as strong

17 evidence that the parties did not intend the covenants to be

18 personal.  Id.   The  court  "view[ed]  the  provision  expressly

19 extending the benefits and burdens of the Agreement to the parties'

20 successors  and  assigns  as  decisive."   Id. It  concluded  that

21 "Section  26.1  entitled  Tri-Met  to  Burlington's  rights  as  a

22 successor in its interest in the fee."  Id. at *3.

23     Although Judge Aiken's decision addressed a different land

24 conveyance, the decisions issued in the case are relevant here.

25 First, as Judge Aiken noted, a conveyance of property "subject to

26 all encumbrances," meant that under the deed, the grantee took the

27 property subject to the MCI ROW Agreement.  The language of the

28 conveyance in the instant case is not materially different from

26 - OPINION & ORDER

1  that in the conveyance discussed in Judge Aiken's case.

2       Second, as the Ninth Circuit noted, Section 26.1 of the MCI

3  ROW Agreement reveals the drafters' intent to have the agreement

4  run with land.   Third, as Judge Aiken noted, the defendant's

5  argument that it retained easement rights, but not the relocation

6  obligations under the MCI ROW Agreement, while the grantee assumed

7  the obligation of the easement without its accompanying rights, "is

8  not a feasible legal proposition."

9       Judge Haggerty's case is more directly on point.  There, both

10  Judge Haggerty and the Ninth Circuit considered a nearly identical

11  easement and the identical land conveyance from BNSF to ODOT.   In

12  that case, TriMet argued that the AT&T ROW Agreement ran with the

13  land when it was conveyed from BNSF to ODOT.  AT&T argued that BNSF

14  reserved its rights and obligations under the AT&T ROW Agreement

15  when it conveyed its interest in the Railroad Corridor to ODOT.

16       Judge Haggerty concluded that BNSF had conveyed the property

17  to ODOT subject to the easement and therefore, ODOT succeeded to

18  BNSF's right to make AT&T relocate the facilities under the

19  relevant provision of the AT&T ROW Agreement.  2006 WL 3408035, at

20  *8.  Judge Haggerty noted that the right to compel AT&T to relocate

21  its facilities at its own expense to allow for placement of

22  railroad tracks was a term and condition of AT&T's easement.  Id.

23       The Ninth Circuit affirmed Judge Haggerty.  AT&T argued that

24  BNSF retained its rights and obligations under the AT&T ROW

25  Agreement "despite conveying to ODOT in fee simple title to the

26  land governed by the ROW, and that those rights and obligations did

27  not run with the land."  2009 WL 725174, at *1.  As in Judge

28  Aiken's case, the court first looked at the provision in the ROW

27 - OPINION & ORDER

agreement providing that the ROW was to be binding upon and inure to the benefit of the parties "and their respective successors or assigns." Id. The court concluded first that this language "indicates that AT&T and BNSF intended the easement to run." Id. Then, the court continued, because the AT&T ROW Agreement ran with the land when BNSF conveyed the Rail Corridor to ODOT, ODOT had authority to require AT&T to relocate its fiber optic facilities at AT&T's expense in order to accommodate the placement of new railroad tracks. Id.

Notably, both Judge Haggerty and the Ninth Circuit quickly disposed of the argument that BNSF reserved the ROW agreement to itself when conveying the real property to ODOT subject to the easement. Both courts stated clearly that once the property was conveyed to ODOT subject to the AT&T ROW Agreement, ODOT could enforce the relocation expense provision against AT&T. Although the AT&T ROW Agreement is not the agreement at issue in this case, any difference between that agreement and the MCI ROW Agreement at issue here is immaterial. Most importantly, the same land conveyance from BNSF to ODOT was at issue before Judge Haggerty and the Ninth Circuit.

Defendant's argument is not supported by Section 2 of the Donation Contract, common sense, Oregon law, and the opinions issued in Judge Aiken's and Judge Haggerty's related cases. Instead, logic and the relevant law (both Oregon property law and the decisions in Judge Aiken's and Judge Haggerty's cases) combine to compel a conclusion that BNSF did not retain the MCI ROW Agreement easement unto itself when it conveyed the subject property to ODOT. Rather, plaintiff succeeded to the rights and

28 - OPINION & ORDER

1  obligations of the MCI ROW Agreement and under Section 13.2, has

2  the authority to require defendant to pay for the relocation of its

3  fiber optic system.

4      Defendant offers two additional arguments that are not

5  persuasive. Separate from the MCI ROW Agreement is the actual

6  Easement Deed related to the easement created by the MCI ROW

7  Agreement. Exh. 2 to Sarratt Declr. Although the MCI ROW

8  Agreement was executed in 1990, the parties to that agreement did

9  not actually execute a deed until October 1998. Id. The deed was

10 recorded in Washington County on January 20, 1999. Id.

11     Section 2.6 of the MCI ROW Agreement provides that upon

12 completion of the construction of the MCI System, defendant "may,

13 at its option, deliver to Railroad documents evidencing one or more

14 easement grants, executed by MCI or one or more of its affiliates

15 exactly in the form of Exhibit B . . . ." Exh. A to Hardiman

16 Declr. at p. 11. If the documents are acceptable to the Railroad,

17 the Railroad was to execute the documents and return them to

18 defendant. Id. Defendant could then record the documents in the

19 appropriate jurisdiction. Id. Exhibit B is a form entitled

20 "Easement Deed and Agreement." Id. at p. 50. The Easement Deed

21 executed by defendant and BNSF is identical to this form.

22     BNSF executed, and defendant recorded, the Easement Deed after

23 the spring 1998 conveyance of the Rail Corridors to ODOT.

24 Defendant argues that the post-conveyance execution and recording

25 of the Easement Deed evidences BNSF's belief that BNSF had

26 reserved, and not conveyed, the corresponding property interest to

27 defendant's fiber optic easement. That is, because the MCI ROW

28 Agreement required the Easement Deed to be executed by "the

29 - OPINION & ORDER

Railroad," BNSF's execution of the deed after it conveyed the Rail Corridors subject to the easement to ODOT, indicates that BNSF saw itself, and not ODOT, as "the Railroad" at that time.

Plaintiff suggests that the late recording of the Easement Deed is better explained by the fact that MCI did not complete the initial construction of the MCI System until 1998, or simply, that having previously completed the MCI System, defendant neglected to prepare the Easement Deed until 1998, and then, BNSF executed it upon presentation because it was required to do so by the terms of the MCI ROW Agreement.

While plaintiff's explanation makes some sense, it is unsupported by any evidence in the record such as when the initial construction of the MCI System was completed, or any deposition testimony, for example, from defendant or BNSF about the timing of the Easement Deed. Nonetheless, I find defendant's preferred interpretation unpersuasive in light of the discussion above. Even if BNSF thought, at the time it executed the Easement Deed, that BNSF had retained the easement as defendant suggests, BNSF did not, in light of the language used in the conveyance documents, common sense, and Oregon law, sufficiently and reasonably articulate that belief.

Finally, defendant states that it has provided, and continues to provide, communication services to BNSF in exchange for the easement created by the ROW Agreement. I agree with plaintiff that the consideration defendant "paid," or continues to "pay" to BNSF for the easement, is irrelevant to whether BNSF retained the easement in the subsequent conveyance of the property to ODOT.

/ / /

30 - OPINION & ORDER

CONCLUSION

I grant plaintiff's motion for summary judgment (#18) and deny defendant's motion for summary judgment (#26).

IT IS SO ORDERED.

Dated this __31st__ day of _March_____, 2010.


___/s/ Dennis James Hubel_____
Dennis James Hubel
United States Magistrate Judge

31 - OPINION & ORDER